IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

UNITED STATES OF AMERICA

v.

JOSEPH ALLEN BALDWIN,

Defendant.

CRIMINAL ACTION FILE

NO.  4:10-CR-032-07-HLM-WEJ

## NON-FINAL REPORT AND RECOMMENDATION

This matter is before the Court on defendant Joseph Allen Baldwin's Motion to Suppress Statements and Motion for Jackson/Denno Hearing [216], and his Amended Motion to Suppress Statements and Motion for Jackson/Denno Hearing and Motion to Suppress Evidence [242].  The Court conducted an evidentiary hearing on said Motions on April 8, 2011 [243], which has been transcribed [265].  The parties have briefed the matter.  (See Br. in Supp. of Def.'s Mot. to Suppres [277] ("Def.'s Br."); Gov't Resp. to Def.'s Mot. to Suppress [284] ("Govt.'s Br.").) On the basis of the testimony and evidence produced at that hearing, the undersigned **REPORTS** that defendant voluntarily provided statements to law enforcement and consented to the search of his home.  Therefore, the undersigned **RECOMMENDS** that defendant's Motions [216, 242] be **DENIED**.

## I.   STATEMENT OF FACTS

### A.   The Defendant's Arrest

Following the grand jury's return of a superceding indictment that included charges against the defendant, the undersigned issued an arrest warrant [104] for him.  Special Agent ("SA") Christopher A. Mueller of the Drug Enforcement Administration executed that arrest warrant on February 2, 2011, at the defendant's residence, located at 1101 Carline Road in Rossville, Georgia. (Tr. 8, 31-32.) There was no search warrant for the residence.  (Id. at 32.)

At about 8:30 a.m. on February 2, SA Mueller and three other law enforcement officers (all armed and dressed in raid attire) went to the defendant's residence; while the others took positions around the house, SA Mueller knocked loudly on the front door.  (Tr. 8-9, 53, 82.)  As he knocked, SA Mueller announced police, but it took a few minutes for Mr. Baldwin to come to door.  (Id. at 9-10.)[1] When Mr. Baldwin opened the door, SA Mueller notified him of the arrest warrant. (Id. at 11.)  Upon hearing that news, Mr. Baldwin stepped back into the house and

---

[1] When he came to the door, the defendant was dressed in pajama bottoms and a blue T-shirt.  (Tr. 33.)  He explained to SA Mueller that he was delayed in answering the door because he had been in the shower.  (Id. at 34.)  Mr. Baldwin repeated that explanation in his direct testimony.  (Id. at 63-64.)

2

allowed SA Mueller to enter along with co-case agent David Gilleland.  (Id. at 11, 34, 64.)[2]

Mr. Baldwin then made inquiry as to why he was being arrested.  (Tr. 12, 38.) SA Mueller replied that the charge was distribution of oxycodone.  (Id.)[3]  Mr. Baldwin asserted that he had not been engaged in such conduct.  (Id. at 12.) Nevertheless, SA Mueller responded that he had an arrest warrant for him; agents then cuffed the defendant with his hands in the front using two sets of handcuffs. (Id.)[4]  Mr. Baldwin was neither thrown to the ground nor up against a wall.  (Id.)[5]

---

[2] SA Mueller testified that his gun was drawn as he knocked on the door; when the door opened, neither he nor Agent Gilleland pointed their guns at Mr. Baldwin. As soon as Mr. Baldwin allowed the officers to enter the residence, SA Mueller holstered his weapon.  (Tr. 11-12.)

[3] Mr. Baldwin asserted that, in answer to his question, the agent with the black beard (i.e., Agent Gilleland) stated that he had been indicted by a grand jury on conspiracy charges to sell a million pills.  (Tr. 64, 66.)

[4] Because Mr. Baldwin is a large man, agents used two sets of cuffs to make him more comfortable.  (Tr. 12, 24.)

[5] SA Mueller identified the defendant in open court as the man he arrested on February 2, 2011.  (Tr. 31.)

3

Once Mr. Baldwin was restrained, SA Mueller asked him if there was anyone else in the house. (Tr. 13, 64.)[6] Mr. Baldwin replied that his wife was in the bedroom. (Id. at 13, 64-65.) In response to SA Mueller's questions of whether there were weapons, cash, or narcotics in the residence, Mr. Baldwin replied, "No, you can go ahead and search." (Id. at 13, 37.)[7] The defendant also called to his wife, who was in the master bedroom, to come out. (Id. at 13.) With coaxing from the agents, she eventually appeared, dressed in a T-shirt and plaid pants. (Id. at 13-14, 33-34, 65.) Mrs. Baldwin did not protest her husband's restraint. (Id. at 13.) Indeed, SA Mueller testified that Mr. Baldwin did not resist the cuffs being placed on him, that he was cooperative all day, and that all persons involved acted calmly. (Id.)

_____

[6] The house is small. (Tr. 14.) One enters through a great room, which opens into a long room, the left side of which is a living room, and the right side of which is a kitchen. (Id.) It has two bedrooms. (Id. at 56.)

[7] On subsequent questioning from the AUSA, SA Mueller testified that Mr. Baldwin said, "You guys can look or words to that effect." (Tr. 14.) However, SA Mueller did not specifically ask to search the house at that point. (Id.) Indeed, SA Mueller clarified that, although he had oral consent to search at this time, he did not begin a search until after Mr. Baldwin signed the consent to search form, discussed infra. (Id. at 37.) Mr. Baldwin's testimony is that he told SA Mueller that he had weapons in the house for protection, and in response to questions about where the guns were located, he replied that they were in the bedroom safe, but that his wife was in there getting dressed. (Id. at 64-65, 76-78.)

4

**B.**      **The Interview at the Defendant's Home**

SA Mueller wanted to speak privately to Mr. Baldwin, so he asked the defendant if he would step back to the bedroom with him.  (Tr. 14-15, 66.)[8]  The defendant, who was still cuffed but very calm and collected, followed SA Mueller into the back bedroom, with Agent Gilleland following the defendant.  (Id. at 15, 34, 38, 66.)  The bedroom was small and crowded.  (Id. at 16.)  In addition to a bed and dresser, the room was crammed with a computer desk and chair, and a closed and locked gun safe; a number of boxes filled with clothing were lined up along a wall.  (Id. at 16, 32.)  Mr. Baldwin sat down on the bed.  (Id. at 16.)  SA Mueller sat down near him in a narrow space between the dresser and the bed with his back to the wall.  (Id.)  Agent Gilleland stood near the door.  (Id. at 16-17.)

SA Mueller began by explaining to the defendant that he (Mueller) was going to read him the Miranda rights before asking him any questions.  (Tr. 36.)  He then showed Mr. Baldwin a DEA form 13A, which is that agency's Miranda waiver form.

---

[8] SA Mueller testified that it is easier to speak with a suspect in private, away from other people.  (Tr. 15.)  Moreover, the defendant's wife was present, and SA Mueller did not know how much knowledge she had about what her husband may have been doing.  (Id.)  Finally, SA Mueller did not want to embarrass the defendant by questioning him in front of his wife, his young daughter, and the two officers who had not been part of the investigation.  (Id.)  A private setting might create better rapport and allow them to be more candid with each other.  (Id.)

(<u>Id.</u> at 17, 36, 45; <u>see also</u> Govt. Ex. 1 (admitted at Tr. 18-19).)  SA Mueller read each of the rights printed on the form to the defendant and asked him if he understood his rights.  (<u>Id.</u> at 17, 36-37, 45, 54.)  Mr. Baldwin shook his head in the affirmative, and when SA Mueller stated that he needed a verbal response, the defendant replied, "Yes."  (<u>Id.</u> at 17, 36, 54.)[9]  SA Mueller then asked Mr. Baldwin if he would talk to them, and if he would, to sign the form.  (<u>Id.</u> at 17.)  The defendant then signed the form with no apparent reservation.  (<u>Id.</u>)  SA Mueller and Agent Gilleland signed the form as witnesses.  (<u>Id.</u>)  The form reflects that it was executed at 8:40 a.m.  (<u>Id.</u> at 53, 86.)[10]  Mr. Baldwin agrees that this form bears his signature.  (<u>Id.</u> at 78-79.)  The defendant testified that he reads and writes the English language and understands the rights printed on the waiver form.  (<u>Id.</u> at 79-80.)

The defendant also signed a "Consent to Search" form.  (Tr. 21, 39; <u>see also</u> Govt. Ex. 2 (admitted at Tr. 22-23).)  SA Mueller noted that, although Mr. Baldwin had earlier given officers permission to search, he asked the defendant again if it were alright for agents to search the residence.  (<u>Id.</u> at 21.)  Mr. Baldwin replied that

[9] Mr. Baldwin testified that he is familiar with the Miranda rights and understands their meaning.  (Tr. 83-84.)

[10] SA Mueller was adamant that he asked no substantive questions of Mr. Baldwin until after he executed the Miranda waiver form.  (Tr. 53-54.)

it was.  (Id.)  SA Mueller then placed the residence address (1101 Carline) on the

blank form and offered it to the defendant to sign if he consented to a search.  (Id.)

The form reflects the defendant's signature.  (Govt. Ex. 2.)  To the best of SA

Mueller's information, 1101 Carline Road was Mr. Baldwin's residence.  (Id. at 21-

22.)[11]

Agents then searched the residence (including the safe) and seized some cash

(in excess of $10,000).  (Tr. 23, 38.)[12]  SA Mueller suspected that the cash was

derived from selling pills.  (Id. at 48-50, 58-59.)[13]  However, agents did not begin

their search until after Mr. Baldwin executed the consent to search form.  (Id. at 55-

56.)  Mr. Baldwin agrees that this form bears his signature.  (Id. at 79.)  He also

_____

[11] Mr. Baldwin testified that he resided at 1101 Carline Road.  (Tr. 62.)

[12] There was no search warrant for the safe. (Tr. 32.) SA Mueller testified that Mr. Baldwin's signed consent to search gave agents permission to search the residence (including the locked safe found therein) and the cars parked outside. (Id. at 32, 56.) SA Mueller did not ask Mr. Baldwin for specific permission to search the safe, but did ask him open it (which he did). (Id. at 32-33.) The safe was searched in the defendant's presence. (Id. at 57.)

[13] During the search, agents also seized Mr. Baldwin's wallet, items located in the wallet (including cash, a small green piece of paper that appeared to be a payee sheet or drug ledger, and some business cards), and a cell phone. (Tr. 47-48, 50-51.) SA Mueller asked the defendant for permission to look through his phone, which was granted. Both the wallet and the cell phone were searched in the defendant's presence. (Id. at 56-57.) Mr. Baldwin denies that SA Mueller searched the wallet in his presence. (Id. at 71-72.)

7

agrees that he was able to read and understand the words found on that consent to search form.  (Id. at 80-81.)

After the defendant signed these forms, and after other agents started the search and entered the safe, SA Mueller (assisted by Agent Gilleland) began the interview with Mr. Baldwin concerning his involvement in the drug conspiracy.  (Tr. 19, 35-36, 38-39, 51-52, 56.)  SA Mueller testified that the defendant appeared to understand his questions and was willing to answer them.  (Id. at 19.)  At some point in the interview, SA Mueller perceived that Mr. Baldwin was being less than truthful.  (Id. at 20.)  In an effort to elicit more truthful testimony, SA Mueller explained the charges to the defendant, their severity, and the extent of the DEA's investigation.  (Id.)  He testified that he did this in an effort to get the defendant to describe truthfully his involvement in the conspiracy.  (Id.)

On cross-examination, SA Mueller testified that, at some point in the interview, either he or Agent Gilleland told Mr. Baldwin that he was involved in a conspiracy that had distributed a million oxycodone pills.  (Tr. 39.)[14]  SA Mueller

---

[14] SA Mueller testified that, during the course of his investigation, he developed information which led him to believe that more than one million pills had been distributed by the Alvarez organization.  In fact, one person had admitted to distributing 800,000 pills; thus, he believed it would be easy to prove that a million pills had been distributed by the twelve conspirators over the five-year life of the

recalled telling Mr. Baldwin that the DEA's investigation had led to many defendants, including Johnny Alvarez, whose telephone had been the subject of a wiretap.  (Id.)  The agent shared with the defendant his belief that the Government could show that, in the course of the conspiracy, over a million oxycodone pills had been illegally distributed.  (Id.)  Mr. Baldwin expressed surprise, and asserted that there was no way that he was involved in the distribution of a million pills.  (Id. at 39, 41.)

SA Mueller accepted Mr. Baldwin's assertion, and replied that it would be a good thing for the defendant if he could give them an idea of how many of those million pills he was responsible for distributing.  (Tr. 39-40.)  SA Mueller testified that, based on his understanding of conspiracy law, if the defendant did not provide information about his relative culpability, he potentially could be responsible for the entire one million pills.  (Id. at 40-41.)  However, SA Mueller testified that Mr. Baldwin was not told that he needed to give the number of pills for which he was responsible or he would be charged with distributing one million pills.  (Id. at 40.)  SA Mueller denied that either he or Agent Gilleland told Mr. Baldwin that they

_____

conspiracy as it operated in numerous states.  (Tr. 54-55.)  Thus, SA Mueller did not "make up" the million pill number in order to elicit statements from Mr. Baldwin.  (Id. at 55.)

would "go easy" on him if he cooperated and that they needed a "big number" from him if he wanted to help himself. (Id. at 40-41, 44-45.) However, agents did inform Mr. Baldwin that this interview was an opportunity for him to make clear what position he played in the conspiracy; otherwise, he could be charged with a full amount in the conspiracy or be found culpable for the full amount. (Id. at 41.) According to SA Mueller, he told Mr. Baldwin that if he provided agents with a "believable number" of pills for which he was responsible, they would tell prosecutors and he would likely not be culpable for the entire million pills. (Id. at 42-43.)

In response to this conversation, Mr. Baldwin told SA Mueller that he believed that he was responsible for selling 20,000 pills that he had received from defendant Alvarez. (Tr. 42, 72, 81.) He expressly disclaimed responsibility for one million pills. (Id. at 42.) As noted above, Mr. Baldwin provided this pill count after SA Mueller had told him that he could be held responsible for a million pills. (Id.) However, SA Mueller told Mr. Baldwin that this number (i.e., 20,000 pills) was not

10

believable.  (Id. at 43.)[15]  Mr. Baldwin did not revise his number in response to SA

Mueller's challenge.  (Id.)[16]

Mr. Baldwin's recollection of the interview is much different than that

provided by SA Mueller.  He claims that when he and the agents reached the

bedroom, one of them said, "Help us help you."  (Tr. 66.)  They explained that this

was his only opportunity to help himself, and that he had been charged with a million

pills and could be culpable for the entire amount.  (Id. at 66-67.)  Agent Gilleland

then reportedly said, "Well, you need to give us a good number" or a "large number."

(Id. at 67-68, 81.)  The defendant responded that he had never even seen a million

pills.  (Id. at 67.)  Mr. Baldwin then claims that, to help himself, he just blurted out,

without thinking, the number 20,000.  (Id. at 67, 81.)[17]

---

[15] In his direct testimony (summarized supra p. 8), SA Mueller said this is where he perceived Mr. Baldwin as being less than truthful.  (Tr. 43.)

[16] At a subsequent interview at the jail, discussed infra, Mr. Baldwin revised this number of pills down to 10,000.  (Tr. 43, 82-83.)  He claimed to have visited Mr. Alvarez's home ten times and received 1,000 pills each time.  (Id. at 43-44.)  However, Mr. Baldwin never denied trafficking in pills.  (Id. at 83.)

[17] Mr. Baldwin apparently did some "thinking."  He testified that he processes numbers quickly.  He thought that one percent of one million would be 10,000, which he believed would not be a large enough number to satisfy the agents, so he doubled it to 20,000.  (Tr. 67-68, 81-82.)

11

The defendant also testified that, as Agent Gilleland was demanding a good number from him, SA Mueller said, "Let me read him his rights" or "We need to stop and read him his rights." (Tr. 68.) Mr. Baldwin asserted that "he was trying to hold him off for whatever reason." (Id.) In response to his attorney's request for more clarity in his testimony, Mr. Baldwin stated that "Agent Gilleland was trying to hold off Agent Mueller at the time." (Id.) He claims that the agents did not stop and read him his rights. (Id. at 69.) One of the agents asked him if he knew his rights, and the defendant replied that he had seen them on TV. (Id.)

However, defendant claims that his rights were not read to him. (Tr. 69.) Instead, Agent Gilleland directed him to open the safe (or at least he thought that was what happened next). (Id.) Despite knowing his rights, Mr. Baldwin did not protest the agents' failure to provide Miranda warnings or assert his right to remain silent or to have an attorney present. (Id. at 85.) He testified that he might have been asked to open the safe upon entering the bedroom, and that he kept asking (about five times) if he had to, because he had heard that officers needed a special search warrant

12

to open a safe.  (Id. at 69-70, 84.)  Given his protests, Agent Gilleland repeatedly told the defendant that he had to open the safe.  (Id. at 70, 84-85.)[18]

Mr. Baldwin also asserts that he did not sign the Miranda waiver form (Govt. Ex. 1) or the consent to search form (Govt. Ex. 2) until near the end of the interview and just before being led out of the bedroom.  (Tr. 67, 70-75, 85.)  He claims that the agents told him that they had not found anything illegal in their search and for him to sign the forms to show that he was cooperating.  (Id. at 71, 73.)  According to Mr. Baldwin, the forms were not read to him.  (Id. at 73.)  Instead, he asserts that agents handed him blanks forms and directed him to sign them.  (Id.)

The interview lasted about forty-five minutes.  (Tr. 20, 72.)  SA Mueller testified that neither he nor any other agent yelled at Mr. Baldwin, threatened him, made him any promises, or pointed a firearm at him.  (Id. at 20-21.)  At no point did Mr. Baldwin ask the agents to stop the search.  (Id. at 57-58.)  After the interview and search concluded, agents gathered everyone in the living room, removed the defendant's cuffs, and allowed him to speak to his wife regarding some personal matters and to play briefly with his child.  (Id. at 23-24, 74-75.)  SA Mueller also

---

[18] When he opened the safe, Mr. Baldwin asserts that agents found $9,400 of the $10,000 in cash that they seized.  (Tr. 71.)  Mr. Baldwin told SA Mueller that the cash came from automobile sales.  (Id. at 52.)

13

informed Mr. Baldwin that, if he were released on bond, then he would have to make arrangements for someone else to safeguard the numerous guns agents had discovered during the consent search of the residence.  (Id. at 24, 47.)[19]  The defendant then signed an evidence bag which contained the cash seized from the residence.  (Id. at 24, 75-76.)

### C.  Interview of the Defendant During Transport and at the Jail

Officers then placed Mr. Baldwin (who was handcuffed in the front) in SA Mueller's vehicle, and he and Agent Gilleland transported the defendant to the Walker County Jail.  (Tr. 24, 75, 82, 86.)  The time was about 10:30 a.m.  (Id. at 24.) During the thirty-minute drive to the jail, SA Mueller discussed with Mr. Baldwin whether he had obtained pills from a defendant other than the suspected lead supplier, Mr. Alvarez.  (Id. at 24-25, 86-87.)  In responding to those questions, Mr. Baldwin appeared to understand SA Mueller.  (Id. at 25.)  During this drive, neither SA Mueller nor any other agent yelled at the defendant, threatened him, made any promises to him, or drove in such an erratic way as to frighten him.  (Id. at 25-26.)

---

[19] Guns were located in each of defendant's cars, under a mattress, and in the safe.  (Tr. 46-47.)  The weapons were not seized.  (Id. at 47, 50.)  Mr. Baldwin asserted that the guns were for his protection; SA Mueller could not tie the guns to any drug crime.  (Id. at 49-50.)

14

Upon arrival at the jail, officers placed Mr. Baldwin in a holding cell and removed the handcuffs. (Tr. 26.) About four hours later, SA Mueller removed the defendant from that cell, led him to an interview room, and questioned him again along with Agent Gilleland. (Id. at 26-27, 87.) The defendant was not restrained in any way, and SA Mueller was not armed. (Id. at 27, 87.) All three gentlemen sat around a conference table and talked. (Id. at 27.) Mr. Baldwin again made statements in response to SA Mueller's questions, providing information about his meetings with Mr. Alvarez and about his firearms; he appeared to understand the questions. (Id. at 27-28, 72, 78, 87.) The interview at the jail lasted about thirty minutes. (Id. at 28.) During this interview, neither SA Mueller nor any other agent yelled at the defendant, threatened him, made any promises to him, or pointed a firearm at him. (Id. at 28.) The interview ended when Mr. Baldwin announced that he was not answering any more questions. (Id. at 29.)

At the conclusion of that interview, SA Mueller and Agent Gilleland escorted the defendant back to the holding cell. (Tr. 28-29.) At about 5:30 p.m., all the defendants who had been arrested that day were placed in a van, transported to the Floyd County Jail, and booked in there in anticipation of their appearance in federal court the next day. (Id. at 29.)

15

SA Mueller testified that, from his first encounter with the defendant at 8:30 a.m. on February 2 through the interview at the jail later that day, he never appeared to be under the influence of drugs or alcohol.  (Tr. 29-30.)  SA Mueller also asserted that he never did anything in an attempt to intimidate Mr. Baldwin.  (<u>Id.</u> at 31.)  According to SA Mueller, the defendant never appeared scared and acted no more nervous than anyone arrested by the DEA might be.  (<u>Id.</u> at 30.)  He never appeared confused, and never complained about being tired.  (<u>Id.</u>)  Although Mr. Baldwin complained about being ill early that morning due to acid reflux, agents made sure that he had his medication; however, he never complained about feeling ill during any interview.  (<u>Id.</u>)  He also never complained about being hungry.  (<u>Id.</u> at 30-31.)  He appeared to understand the English language and the questions that he was being asked.  (<u>Id.</u> at 54.)  Finally, at no point on February 2 did the defendant ask for an attorney.  (<u>Id.</u> at 31.)

## II.   **THE CHARGING DOCUMENT**

On February 1, 2011, the grand jury returned a First Superceding Indictment charging Mr. Baldwin with membership in a multi-defendant oxycodone distribution conspiracy in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(C).  (Supr.

Indict. [53] Count One.)  That Indictment also contains a forfeiture provision against Mr. Baldwin.

## III.    **CONTENTIONS OF THE PARTIES**

Mr. Baldwin asserts that any statements he made to law enforcement should be suppressed because they were made in response to interrogation without the benefit of Miranda warnings.  He also asserts that his statements should be suppressed because they were coerced, i.e., made under threat of heightened prosecution and in response to a promise for benefit in exchange for cooperation. Finally, Mr. Baldwin argues that any physical evidence seized during the search of his home should be suppressed because the search was illegal and went beyond the scope of any consent that may have been given.  (Def.'s Br. 6-13.)

The Government responds that Miranda warnings were administered before defendant made any statements in response to law enforcement questioning.  Further, after receiving those warnings, defendant voluntarily made statements and consented to the search of his residence.  (Govt.'s Br. 8-15.)

17

**IV.   ANALYSIS**

**A.   Defendant's Statements**

In <u>Jackson v. Denno</u>, 378 U.S. 368, 376-77 (1964), the Supreme Court held that a defendant has a constitutional right to a fair hearing and an independent and reliable determination of the voluntariness of a confession before it is allowed to be heard by a jury.  Title 18 U.S.C. § 3501(a) codifies the <u>Jackson v. Denno</u> requirement for criminal prosecutions and provides that, before a confession or self-incriminating statement is received in evidence, "the trial judge shall, out of the presence of the jury, determine any issue as to voluntariness."  <u>United States v. Davidson</u>, 768 F.2d 1266, 1270 n.1 (11th Cir. 1985).

A two-part inquiry determines the admissibility of a confession or self-incriminating statement.  First, the Court must consider whether the Government complied with the requirements of <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966). Second, if those requirements were met, the Court must consider whether the confession or self-incriminating statement was voluntary.  <u>United States v. Jones</u>, 32 F.3d 1512, 1516 (11th Cir. 1994) (per curiam); <u>United States v. Sims</u>, 719 F.2d 375, 378 (11th Cir. 1983) (per curiam).  The Court makes these inquiries separately below.

18

### 1.   Compliance with Miranda

In Miranda, the Supreme Court noted that, "when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized."  384 U.S. at 478.  Therefore, the Court held that the procedural safeguard of warning the suspect of his constitutional rights must be instituted to protect the privilege.  Id. at 478-79.  These so-called Miranda warnings "are required before any statement may be admitted into evidence at trial which was elicited from a person in custody through interrogation." Endress v. Dugger, 880 F.2d 1244, 1248 (11th Cir. 1989).

It is undisputed that defendant was in custody at all relevant times and that his statements were elicited through interrogation.  It is further undisputed that defendant received his Miranda warnings and waived those rights, verbally and in writing. Thus, the first prong of the Court's analysis is satisfied, at least with respect to statements made during transport and at the jail.  The sole dispute is whether the Miranda warnings and waiver form were presented to defendant at the outset of the interview, as the Government contends, or near the end of the bedroom interview, as Mr. Baldwin testified.

19

Defendant does not deny signing and understanding that form, but contends that neither the Miranda rights nor the form were presented to him until near the end of the bedroom interview.  However, whether because of honestly mistaken memory or because a defendant facing felony charges has incentive to fabricate, Mr. Baldwin's testimony does not outweigh the testimony at the hearing showing that Agents Mueller and Gilleland administered Miranda warnings to Mr. Baldwin in his bedroom at the outset of their interview at approximately 8:40 a.m., as recorded on the Miranda waiver form that defendant signed.  (Govt. Ex. 1.)[20]  The Court thus finds SA Mueller's testimony more credible than the defendant's.

## 2.   Voluntariness

Determining whether a confession or incriminating statement is voluntary depends on whether, under all of the surrounding circumstances, the statement was the product of the accused's "free and rational" choice.  Jones, 32 F.3d at 1516.  In Arizona v. Fulminate, 499 U.S. 279, 285-88 (1991), the Supreme Court held that the issue of voluntariness is determined by the totality of the circumstances.  In evaluating the totality of the circumstances, the district court must assess whether law

---

[20] The Government declined to have Agent Gilleland testify.  (See Tr. 59, 88.) The AUSA repeated that the agent's testimony would mirror SA Mueller's testimony.  (Id. at 88.)

enforcement conduct was "causally related" to the confession.  Jones, 32 F.3d at

1516-17.  The standard applied in the Eleventh Circuit is as follows:

> Sufficiently coercive conduct normally involves subjecting the accused
> to an exhaustingly long interrogation, the application of physical force
> or the threat to do so, or the making of a promise that induces a
> confession.  Isolated incidents of police deception, and discussions of
> realistic penalties for cooperative and non-cooperative defendants, are
> normally insufficient to preclude free choice.

Id. at 1517 (quoting United States v. Mendoza-Cecelia, 963 F.2d 1467, 1475 (11th

Cir. 1992)), abrogated on other grounds, Coleman v. Singletary, 30 F.3d 1420 (11th

Cir. 1994).

In this case, the totality of the circumstances shows that Mr. Baldwin's

statements were made voluntarily.  There is no assertion that defendant was subjected

to an unusually long detention or interrogation or that he was physically harmed or

threatened.   Defendant argues that his statements were coerced because law

enforcement threatened to charge him with distribution of one million pills if he

failed to give them a "good number."

However, "a truthful and noncoercive statement of the possible penalties

which an accused faces may be given to the accused without leading to an

involuntary statement."  United States v. Davidson, 768 F.2d 1266, 1271 (11th Cir.

21

1985) (citation and internal quotation omitted).  SA Mueller did not suggest any specific penalties to defendant, but informed him that he faced criminal liability for his involvement in a long-term, wide-ranging conspiracy, and that his liability potentially encompassed the full scope of the conspiracy.  Those statements were truthful.  See United States v. Aguera, 281 F. App'x 893, 895 (11th Cir. 2008) (per curiam) (extent of conspirator liability depends on knowledge of nature and scope of conspiracy, and level of participation in scheme).

Moreover, even if the questioning occurred as defendant recalled, his own testimony reveals that his statements were voluntary.  Defendant testified that he understood his rights based on hearing them on TV and that he answered questions without protest.  (Tr. 85.)  Defendant explained, "I figured it was my only chance to help myself.  I needed to help myself all I could."  (Id.)  Thus, under the totality of the circumstances, the Court must conclude that Mr. Baldwin made a knowing, voluntary, and intelligent waiver of his right to remain silent.  See Singleton v. Thigpen, 847 F.2d 668, 670 (11th Cir. 1988) ("[a] confession by a defendant will be deemed voluntary if the defendant makes an independent and informed choice of his own free will, possessing the capability to do so, his will not being overborne by the pressures and circumstances swirling around him.") (citation and internal quotation

22

omitted).   Therefore, Mr. Baldwin's Motions to Suppress Statements should be **DENIED**.

### B.   Search of Defendant's Residence

Defendant contends that the "search of the safe and the wallet went beyond the scope of any consent [he] could be construed as having given." (Def.'s Br. 10.) "A consensual search is manifestly reasonable so long as it remains within the scope of the consent." United States v. Martinez, 949 F.2d 1117, 1119 (11th Cir. 1992) (citing Florida v. Jimeno, 500 U.S. 248, 249 (1991)). "When a defendant gives a general statement of consent, the scope of the permissible search 'is constrained by the bounds of reasonableness: what a police officer could reasonably interpret the consent to encompass.'" United States v. Telcy, 362 F. App'x 83, 87 (11th Cir. 2010) (per curiam) (quoting United States v. Street, 472 F.3d 1298, 1308 (11th Cir. 2006)).

As summarized above, defendant verbally consented to a search of the house in response to SA Mueller's query whether there were weapons, cash, or narcotics in the house.[21]   In addition, defendant signed a form granting consent to search his

---

[21] Although his testimony did not match SA Mueller's, defendant did not testify to any objection he might have made when the agents "said something about looking around the house or whatever." (See Tr. 64-65.)

AO 72A
(Rev.8/82)

property and vehicles.  (Govt. Ex. 2.)  Permission to search an area for narcotics "may be construed as permission to search any compartment or container within the specified area where narcotics may be found."  <u>Martinez</u>, 949 F.2d at 1119.

There is no evidence as to where the wallet was found, only that it was handed to SA Mueller by another agent. (Tr. 48-49.)  At that time, given defendant's general consent to the search for cash and narcotics (either of which might be found in a wallet), it was reasonable for SA Mueller to believe the consent encompassed the wallet.

The remaining issue is whether defendant limited his consent when the agents asked him to open the safe.  SA Mueller testified that when he asked defendant to open the safe, defendant did so without asking whether he was required to and without asking multiple times whether he had to open the safe.  (Tr. 33.)  Mr. Baldwin testified that he acquiesced to opening the safe only after SA Gilleland reiterated approximately five times that defendant had to open it.  (<u>Id.</u> at 70.) However, defendant did not refuse to open the safe.  <u>See, e.g.</u>, <u>United States v. Rios</u>, No. 2:09-cr-52-FtM-29DNF, 2009 WL 4510111, at *5 (M.D. Fla. Nov. 30, 2009) ("When the Defendant indicated that he would not consent to a search of the locked safe, [police officer] stopped searching the room and went to obtain a search

24

warrant.").  The Court again finds SA Mueller's testimony on this point credible.

Thus, no basis exists to suppress the items found in defendant's wallet or safe.

## V.   **CONCLUSION**

For the reasons stated above, the undersigned **RECOMMENDS** that defendant's Motion to Suppress Statements and Motion for Jackson/Denno Hearing [216], and his Amended Motion to Suppress Statements and Motion for Jackson/Denno Hearing and Motion to Suppress Evidence [242], be **DENIED**.

**SO RECOMMENDED**, this 17th day of June, 2011.


_____
WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE

25

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

UNITED STATES OF AMERICA

     v.

JOSEPH BALDWIN,

     Defendant.

CRIMINAL ACTION FILE

NO.  4:10-CR-0032-07-HLM-WEJ

**ORDER FOR SERVICE OF**
**NON-FINAL REPORT AND RECOMMENDATION**

Let this Non-Final Report and Recommendation of the United States Magistrate Judge, made in accordance with 28 U.S.C. § 636(b)(1)(B) and the Court's Local Criminal Rule 58.1(A)(3)(a), be filed and a copy, together with a copy of this Order, be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if any, to the Non-Final Report and Recommendation within fourteen days of the receipt of this Order.  Should objections be filed, they shall specify with particularity the alleged error(s) made (including reference by page number to any transcripts if applicable) and shall be served upon the opposing party.  The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing

for review by the District Court.  Failure to object to this Non-Final Report and Recommendation waives a party's right to review.  Fed. R. Crim. P. 58(b)(2).

The Clerk is directed to submit the Non-Final Report and Recommendation with objections, if any, to the District Court after expiration of the above time period.

**SO ORDERED**, this 17th day of June, 2011.

WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE

2