# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ROME DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | CRIMINAL ACTION FILE NO. |
| JOSEPH ALLEN BALDWIN. | 4:10-CR-032-07-HLM |

## ORDER

This case is before the Court on Defendant's Motion to Suppress Statements and Motion for Jackson/Denno Hearing [216], Defendant's Amended Motion to Suppress Statements and Motion for Jackson/Denno Hearing and Motion to Suppress Evidence [242], and on the Non-Final Report and Recommendation of United States Magistrate Judge Walter E. Johnson [290].

AO 72A
(Rev.8/82)

## I.   Standard of Review

28 U.S.C.A. § 636(b)(1) requires that in reviewing a magistrate judge's report and recommendation, the district court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C.A. § 636(b)(1).  The Court therefore must conduct a de novo review if a party files "a proper, specific objection" to a factual finding contained in the report and recommendation. Macort v. Prem, Inc., 208 F. App'x 781, 784 (11th Cir. 2006); Jeffrey S. by Ernest S. v. State Bd. of Educ., 896 F.2d 507, 513 (11th Cir. 1990); United States v. Gaddy, 894 F.2d 1307, 1315 (11th Cir. 1990); LoConte v. Dugger, 847 F.2d 745, 750 (11th Cir. 1988).  If no party files a timely

2

objection to a factual finding in the report and recommendation, the Court reviews that finding for clear error. Macort, 208 F. App'x at 784. Legal conclusions, of course, are subject to de novo review regardless of whether a party specifically objects. United States v. Keel, 164 F. App'x 958, 961 (11th Cir. 2006); United States v. Warren, 687 F.2d 347, 347 (11th Cir. 1982).

## II. Background

### A. Factual Background

#### 1. Defendant's Arrest

After a federal grand jury sitting in the Northern District of Georgia returned a superseding indictment that included charges against Defendant, Judge Johnson issued an arrest warrant for Defendant. (Docket Entry No. 104.) On

3

February 2, 2011, Special Agent ("SA") Christopher A. Mueller of the Drug Enforcement Administration executed that arrest warrant at Defendant's residence, located at 1101 Carline Road in Rossville, Georgia.  (Tr. at 8, 31-32.) The agents did not have a search warrant for the residence. (Id. at 32.)

At about 8:30 a.m. on February 2, SA Mueller and three other law enforcement officers, all armed and dressed in raid attire, went to Defendant's residence; while the others took positions around the house, SA Mueller knocked loudly on the front door.  (Tr. at 8-9, 53, 82.)  While he knocked, SA Mueller announced, "police," but it took a few minutes for Defendant to come to door.  (Id. at 9-10.)[1]  When

---

[1]When Defendant came to the door, he was dressed in pajama bottoms and a blue T-shirt.  (Tr. at 33.)  Defendant

4

Defendant opened the door, SA Mueller notified him of the arrest warrant.  (Id. at 11.)   Upon hearing that news, Defendant stepped back into the residence and allowed SA Mueller to enter, along with co-case agent David Gilleland. (Id. at 11, 34, 64.)[2]

Defendant then asked why he was being arrested.  (Tr. at 12, 38.)   SA Mueller replied that the charge was distribution of oxycodone. (Id.)[3] Defendant asserted that he

_____

explained to SA Mueller that he was delayed in answering the door because he had been in the shower.  (Id. at 34.)   Defendant repeated that explanation in his direct testimony.  (Id. at 63-64.)

[2]SA Mueller testified that his gun was drawn as he knocked on the door, and that, when Defendant opened the door, neither SA Mueller nor Agent Gilleland pointed their guns at Defendant.  As soon as Defendant allowed the officers to enter the residence, SA Mueller holstered his weapon.  (Tr. at 11-12.)

[3]Defendant asserted that, in answer to his question, the agent with the black beard (that is, Agent Gilleland) stated that Defendant had been indicted by a grand jury on conspiracy charges to sell a million pills.  (Tr. at 64, 66.)

5

had not been engaged in such conduct.   (Id. at 12.)
Nevertheless, SA Mueller responded that he had an arrest
warrant for Defendant, and agents then cuffed Defendant
with his hands in the front, using two sets of handcuffs.
(Id.)[4] The agents did not throw Defendant to the ground nor
up against a wall.  (Id.)[5]

Once the agents restrained Defendant, SA Mueller
asked Defendant if there was anyone else in the residence.
(Tr. at 13, 64.)[6] Defendant  replied that his wife was in the

_____

[4]Defendant is a large man, and the agents used two sets of
cuffs to make him more comfortable.  (Tr. at 12, 24.)

[5]In open court, SA Mueller identified Defendant as the man he
arrested on February 2, 2011.  (Tr. at 31.)

[6]The residence is small.  (Tr. at 14.)  One enters through a
great room, which opens into a long room, the left side of which is
a living room, and the right side of which is a kitchen.  (Id.)  The
residence has two bedrooms.  (Id. at 56.)

6

bedroom. (Id. at 13, 64-65.)  In response to SA Mueller's questions concerning whether there were weapons, cash, or narcotics in the residence, Defendant replied, "No, you can go ahead and search."  (Id. at 13, 37.)[7]  Defendant also called to his wife, who was in the master bedroom, to come out. (Id. at 13.)  With coaxing from the agents, Defendant's wife eventually appeared, dressed in a T-shirt and plaid pants.  (Id. at 13-14, 33-34, 65.)  Mrs. Baldwin did not

---

[7]During subsequent questioning from the Government's counsel, SA Mueller testified that Defendant said, "You guys can look or words to that effect." (Tr. at 14.)  SA Mueller, however, did not specifically ask to search the residence at that point.  (Id.) Indeed, SA Mueller clarified that, although he had oral consent to search at this time, he did not begin a search until after Defendant signed the consent to search form, discussed infra.  (Id. at 37.) Defendant testified that he told SA Mueller that he had weapons in the residence for protection, and that, in response to questions about where the guns were located, he stated that the guns were in the bedroom safe, but that his wife was in there getting dressed. (Id. at 64-65, 76-78.)

7

protest Defendant's restraint. (Id. at 13.) Indeed, SA Mueller testified that Defendant did not resist the cuffs being placed on him, that Defendant was cooperative all day, and that all individuals involved acted calmly. (Id.)

## 2. The Interview at Defendant's Home

SA Mueller wanted to speak privately to Defendant; therefore, he asked Defendant if he would step back to the bedroom with him. (Tr. at 14-15, 66.)[8] Defendant, who was still cuffed but very calm and collected, followed SA Mueller

_____

[8] SA Mueller testified that it is easier to speak with a suspect in private, away from other people. (Tr. at 15.) Additionally, Defendant's wife was present, and SA Mueller did not know how much knowledge she had about what Defendant may have been doing. (Id.) Further, SA Mueller did not want to embarrass Defendant by questioning him in front of his wife, his young daughter, and the two officers who had not been part of the investigation. (Id.) According to SA Mueller, he believed a private setting might create better rapport and allow him and Defendant to be more candid with each other. (Id.)

8

into the back bedroom, with Agent Gilleland following Defendant. (Id. at 15, 34, 38, 66.)  The bedroom was small and crowded. (Id. at 16.)  In addition to a bed and dresser, the room was crammed with a computer desk and chair, and a closed and locked gun safe; a number of boxes filled with clothing were lined up along a wall.  (Id. at 16, 32.) Defendant sat down on the bed. (Id. at 16.)  SA Mueller sat down near him in a narrow space between the dresser and the bed with his back to the wall.  (Id.)  Agent Gilleland stood near the door. (Id. at 16-17.)

SA Mueller began by explaining to Defendant that SA Mueller was going to read Defendant the Miranda rights before asking him any questions.  (Tr. at 36.)  SA Mueller then showed Defendant a DEA form 13A, which is that

9

agency's Miranda waiver form.  (Id. at 17, 36, 45; Govt. Ex. 1 (admitted at Tr. 18-19).)  SA Mueller read each of the rights printed on the form to Defendant, and asked Defendant if he understood his rights.  (Id. at 17, 36-37, 45, 54.)  Defendant shook his head in the affirmative, and when SA Mueller stated that he needed a verbal response, Defendant replied, "Yes."  (Id. at 17, 36, 54.)[9]  SA Mueller then asked Defendant if he would talk to them, and if Defendant would, to sign the form.  (Id. at 17.)  Defendant then signed the form, with no apparent reservation.  (Id.) SA Mueller and Agent Gilleland signed the form as witnesses.  (Id.)  The form reflects that it was executed at

---

[9]Defendant testified that he is familiar with the Miranda rights and understands their meaning.  (Tr. at 83-84.)

8:40 a.m.  (Id. at 53, 86.)[10]  Defendant agrees that this form

bears his signature.  (Id. at 78-79.)  Defendant also testified

that he reads and writes the English language, and that he

understands the rights printed on the waiver form.  (Id. at

79-80.)

Defendant also signed a "Consent to Search" form.  (Tr.

at 21, 39; Govt. Ex. 2 (admitted Tr. at 22-23).)  SA Mueller

noted that, although Defendant had given the agents

permission to search earlier, SA Mueller asked Defendant

again if it was all right for agents to search the residence.

(Id. at 21.)  Defendant replied that it was.  (Id.)  Defendant

then placed the residence address, 1101 Carline Road, on

---

[10]SA Mueller was adamant that he asked no substantive
questions of Defendant until after Defendant executed the Miranda
waiver form.  (Tr. at 53-54.)

11

the blank form and offered it to Defendant to sign if Defendant consented to a search.  (Id.)  The form reflects Defendant's signature.  (Govt. Ex. 2.)  To the best of SA Mueller's information, 1101 Carline Road was Defendant's residence.  (Id. at 21-22.)[11]

Agents then searched the residence, including the safe, and seized cash in excess of $10,000.  (Tr. at 23, 38.)[12]  SA Mueller suspected that the cash was derived from selling

---

[11]Defendant testified that he resided at 1101 Carline Road. (Tr. at 62.)

[12]There was no search warrant for the safe.  (Tr. at 32.)  SA Mueller testified that Defendant's signed consent to search gave the agents permission to search the residence, including the locked safe found therein, and the cars parked outside.  (Id. at 32, 56.)  SA Mueller did not ask Defendant for specific permission to search the safe, but did ask him to open it, which he did.  (Id. at 32-33.)  The safe was searched in Defendant's presence.  (Id. at 57.)

12

pills. (Id. at 48-50, 58-59.)[13]  The agents, however, did not

begin their search until after Defendant executed the

consent to search form.  (Id. at 55-56.)  Defendant agrees

that this form bears his signature.  (Id. at 79.)  Defendant

also agrees that he could read and understand the words

found on that consent to search form.  (Id. at 80-81.)

After Defendant signed those forms, and after other

agents started the search and entered the safe, SA Mueller,

assisted by Agent Gilleland, began the interview with

Defendant concerning his involvement in the drug

---

[13]During the search, agents also seized Defendant's wallet, items located in the wallet, including cash, a small green piece of paper that appeared to be a payee sheet or drug ledger, and some business cards, and a cell phone.  (Tr. at 47-48, 50-51.)  SA Mueller asked Defendant for permission to look through his phone, which Defendant granted.  The agents contend that they searched both the wallet and the cell phone in Defendant's presence.  (Id. at 56-57.)  Defendant, however, denies that SA Mueller searched the wallet in his presence.  (Id. at 71-72.)

13

conspiracy. (Tr. at 19, 35-36, 38-39, 51-52, 56.) SA Mueller testified that Defendant appeared to understand his questions and was willing to answer the questions. (Id. at 19.) At some point in the interview, SA Mueller perceived that Defendant was being less than truthful. (Id. at 20.) In an effort to elicit more truthful testimony from Defendant, SA Mueller explained the charges to Defendant, their severity, and the extent of the DEA's investigation. (Id.) SA Mueller testified that he did so in an effort to get Defendant to describe truthfully his involvement in the conspiracy. (Id.)

On cross-examination, SA Mueller testified that, at some point in the interview, either he or Agent Gilleland told Defendant that Defendant was involved in a conspiracy that

14

had distributed a million oxycodone pills. (Tr. at 39.)[14]  SA

Mueller recalled telling Defendant that the DEA's

investigation had led to many defendants, including Johnny

Alvarez, whose telephone had been the subject of a wiretap.

(Id.)  SA Mueller shared with Defendant his belief that the

Government could prove that, in the course of the

conspiracy, the participants had illegally distributed over a

million oxycodone pills. (Id.) Defendant expressed surprise,

and asserted that there was no way that he was involved in

the distribution of a million pills. (Id. at 39, 41.)

_____

[14]SA Mueller testified that, during the course of his
investigation, he developed information that led him to believe that
the Alvarez organization had distributed more than one million pills.
In fact, one person had admitted to distributing 800,000 pills; thus,
SA Mueller believed that it would be easy to prove that the twelve
conspirators had distributed a million pills over the five-year life of
the conspiracy as it operated in numerous states. (Tr. at 54-55.)
Thus, SA Mueller did not "make up" the million pill number in order
to elicit statements from Defendant. (Id. at 55.)

15

SA Mueller accepted Defendant's assertion, and replied that it would be a good thing for Defendant if he could give the agents an idea of how many of those million pills he was responsible for distributing. (Tr. at 39-40.) SA Mueller testified that, based on his understanding of conspiracy law, if Defendant did not provide information about his relative culpability, Defendant potentially could be responsible for the entire one million pills. (Id. at 40-41.) However, SA Mueller testified that the agents did not tell Defendant that he needed to give the number of pills for which he was responsible or he would be charged with distributing one million pills. (Id. at 40.) SA Mueller denied that either he or Agent Gilleland told Defendant that they would "go easy" on him if he cooperated and that they needed a "big number"

16

from him if he wanted to help himself. (Id. at 40-41, 44-45.) However, the agents informed Defendant that this interview was an opportunity for Defendant to make clear what position he played in the conspiracy; otherwise, Defendant could be charged with the full amount of drugs involved in the conspiracy or be found culpable for the full amount. (Id. at 41.) According to SA Mueller, he told Defendant that, if Defendant provided agents with a "believable number" of pills for which he was responsible, they would tell the prosecutors and Defendant would likely not be culpable for the entire million pills. (Id. at 42-43.)

In response to this conversation, Defendant told SA Mueller that Defendant believed that he was responsible for selling 20,000 pills that he had received from Defendant

17

Alvarez.   (Tr. at 42, 72, 81.)   Defendant expressly disclaimed responsibility for one million pills. (Id. at 42.) As noted above, Defendant provided a pill count of 20,000 pills after SA Mueller told Defendant that he could be held responsible for a million pills. (Id.) However, SA Mueller told Defendant that the 20,000 pill number was not believable. (Id. at 43.)[15]   Defendant did not revise his number in response to SA Mueller's challenge. (Id.)[16]

Defendant's recollection of the interview differs markedly from SA Mueller's testimony. Defendant claims

_____

[15]In his direct testimony, SA Mueller stated that, at this point, he perceived Defendant as being less than truthful. (Tr. at 43.)

[16]At a subsequent interview at the jail, discussed infra, Defendant revised this number of pills down to 10,000. (Tr. at 43, 82-83.) Defendant claimed to have visited Defendant Alvarez's home ten times and received 1,000 pills each time. (Id. at 43-44.) Defendant, however, never denied trafficking in pills. (Id. at 83.)

18

that when he and the agents reached the bedroom, one of them said, "Help us help you." (Tr. at 66.) According to Defendant, the agents explained that this was his only opportunity to help himself, and that he had been charged with a million pills and could be culpable for the entire amount. (Id. at 66-67.) Defendant recalled that Agent Gilleland then said, "Well, you need to give us a good number" or a "large number." (Id. at 67-68, 81.) According to Defendant, he had never even seen a million pills. (Id. at 67.) Defendant claims that, to help himself, he just blurted out the number 20,000 without thinking. (Id. at 67, 81.)[17]

---

[17]Defendant apparently did some "thinking." Defendant testified that he processes numbers quickly. According to Defendant, he thought that one percent of one million would be 10,000, which he believed would not be a large enough number to satisfy the agents, so he doubled the number to 20,000. (Tr. at 67-68, 81-82.)

19

Defendant also testified that, as Agent Gilleland was demanding a good number from him, SA Mueller said, "Let me read him his rights," or "We need to stop and read him his rights." (Tr. at 68.)  Defendant asserted that "he was trying to hold him off for whatever reason."  (Id.)  In response to his attorney's request for more clarity in his testimony, Defendant stated that "Agent Gilleland was trying to hold off Agent Mueller at the time." (Id.)  According to Defendant, the agents did not stop and read him his rights. (Id. at 69.)  Defendant recalls that one of the agents asked him if he knew his rights, and that Defendant replied that he had seen them on TV.  (Id.)

Defendant, however, contends that the agents did not read his rights to him.  (Tr. at 69.)  Instead, according to

20

Defendant, Agent Gilleland directed him to open the safe, or at least Defendant thought that was what happened next. (Id.) Despite knowing his rights, Defendant did not protest the agents' failure to provide Miranda warnings or assert his right to remain silent or to have an attorney present. (Id. at 85.) Defendant testified that the agents might have asked him to open the safe upon entering the bedroom, and that Defendant asked approximately five times if he had to, because Defendant had heard that officers needed a special search warrant to open a safe. (Id. at 69-70, 84.) According to Defendant, despite his protests, Agent Gilleland repeatedly told Defendant that he had to open the safe. (Id. at 70, 84-85.)[18]

---

[18]Defendant asserts that the agents found $9,400 of the $10,000 cash they seized when Defendant opened the safe. (Tr.

Defendant also asserts that he did not sign the Miranda waiver form, (Govt. Ex. 1), or the consent to search form, (Govt. Ex. 2), until near the end of the interview and just before the agents led him out of the bedroom. (Tr. at 67, 70-75, 85.) Defendant claims that the agents told him that they had not found anything illegal in their search and for Defendant to sign the forms to show that he was cooperating. (Id. at 71, 73.) According to Defendant, the agents did not read the forms to him. (Id. at 73.) Instead, Defendant asserts that the agents handed him blank forms and directed him to sign them. (Id.)

The interview lasted about forty-five minutes. (Tr. at 20, 72.) SA Mueller testified that neither he nor any other agent

_____

at 71.) Defendant told SA Mueller that the cash came from automobile sales. (Id. at 52.)

22

yelled at Defendant, threatened him, made him any promises, or pointed a firearm at him. (Id. at 20-21.) At no point did Defendant ask the agents to stop the search. (Id. at 57-58.) After the interview and search concluded, the agents gathered everyone in the living room, removed Defendant's handcuffs, and allowed Defendant to speak to his wife regarding some personal matters and to play briefly with his child. (Id. at 23-24, 74-75.) SA Mueller also informed Defendant that, if he were released on bond, then Defendant would have to make arrangements for someone else to safeguard the numerous guns agents had discovered during the consent search of the residence. (Id. at 24, 47.)[19] Defendant then signed an evidence bag, which

---

[19]The agents found guns in each of Defendant's cars, under a mattress, and in the safe. (Tr. at 46-47.) The agents did not seize

23

contained the cash seized from the residence.  (Id. at 24, 75-76.)

### 3.  Interview of Defendant During Transport and at the Jail

Officers then placed Defendant, who was handcuffed in the front, in SA Mueller's vehicle, and he and Agent Gilleland transported Defendant to the Walker County Jail. (Tr. at 24, 75, 82, 86.)  The time was approximately 10:30 a.m. (Id. at 24.) During the thirty-minute drive to the jail, SA Mueller discussed with Defendant whether Defendant had obtained pills from a defendant other than the suspected lead supplier, Defendant Alvarez. (Id. at 24-25, 86-87.) In responding to those questions, Defendant appeared to

the weapons.  (Id. at 47, 50.)  Defendant asserted that the guns were for his protection, and SA Mueller could not tie the guns to any drug crime.  (Id. at 49-50.)

24

understand SA Mueller.  (Id. at 25.)   During this drive, neither SA Mueller nor any other agent yelled at Defendant, threatened him, made any promises to him, or drove in such an erratic way as to frighten him.  (Id. at 25-26.)

After arriving at the jail, officers placed Defendant in a holding cell and removed the handcuffs.   (Tr. at 26.) Approximately four hours later, SA Mueller removed Defendant from the holding cell, led him to an interview room, and questioned him again along with Agent Gilleland. (Id. at 26-27, 87.)  Defendant was not restrained in any way, and SA Mueller was not armed.  (Id. at 27, 87.)  All three gentlemen sat around a conference table and talked. (Id. at 27.)  Defendant again made statements in response to SA Mueller's   questions,   providing   information   about   his

25

meetings with Defendant Alvarez and about his firearms, and Defendant appeared to understand the questions. (Id. at 27-28, 72, 78, 87.)   The interview at the jail lasted approximately thirty minutes.   (Id. at 28.)   During this interview, neither SA Mueller nor any other agent yelled at Defendant, threatened him, made any promises to him, or pointed a firearm at him. (Id. at 28.)  The interview ended when Defendant announced that he would not answer any more questions.  (Id. at 29.)

At the conclusion of that interview, SA Mueller and Agent Gilleland escorted Defendant back to the holding cell. (Tr. at 28-29.)  At about 5:30 p.m., all the defendants who had been arrested on that day were placed in a van, transported to the Floyd County Jail, and booked into that

26

facility in anticipation of their appearance in federal court the next day. (Id. at 29.)

SA Mueller testified that, from his first encounter with Defendant at 8:30 a.m. on February 2 through the interview at the jail later that day, Defendant never appeared to be under the influence of drugs or alcohol. (Tr. at 29-30.) SA Mueller also asserted that he never did anything in an attempt to intimidate Defendant. (Id. at 31.) According to SA Mueller, Defendant never appeared scared and acted no more nervous than anyone arrested by the DEA might be. (Id. at 30.) Defendant never appeared confused, and never complained about being tired. (Id.) Although Defendant complained about being ill early that morning due to acid reflux, agents made sure that Defendant had his medication,

27

and Defendant never complained about feeling ill during any interview.  (<u>Id.</u>)  Defendant also never complained about being hungry.  (<u>Id.</u> at 30-31.)  Defendant appeared to understand the English language and the questions that the agents asked him.  (<u>Id.</u> at 54.)  Finally, at no point on February 2 did Defendant ask for an attorney.  (<u>Id.</u> at 31.)

## B.  Procedural Background

On February 1, 2011, the grand jury returned a First Superseding Indictment charging Defendant with membership in a multi-defendant oxycodone distribution conspiracy, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(C).  (Supr. Indict. Count One.)  The indictment also contains a forfeiture provision against Defendant.

28

On March 27, 2011, Defendant filed a Motion to Suppress Statements and Motion for Jackson-Denno Hearing. (Docket Entry No. 216.) On April 8, 2011, Defendant filed an Amended Motion to Suppress Statements, Motion for Jackson-Denno Hearing, and Motion to Suppress Evidence. (Docket Entry No. 242.) On April 8, 2011, Judge Johnson held an evidentiary hearing to address Defendant's Motions to Suppress. (Docket Entry No. 265.)

On June 17, 2011, Judge Johnson issued his Non-Final Report and Recommendation. (Docket Entry No. 290.) Judge Johnson recommends that the Court deny Defendant's Motions to Suppress.

29

As of the date of this Order, the Clerk's docket indicates that Defendant has not filed Objections to the Non-Final Report and Recommendation. The time period in which Defendant could file Objections has expired, and the Court consequently finds that this matter is ripe for resolution.

## III. Discussion

### A. Defendant's Statements

In <u>Jackson v. Denno</u>, 378 U.S. 368, 376-77 (1964), the Supreme Court held that a defendant has a constitutional right to a fair hearing and an independent and reliable determination of the voluntariness of a confession before it is allowed to be heard by a jury. 18 U.S.C. § 3501(a) codifies the <u>Jackson v. Denno</u> requirement for criminal prosecutions and provides that, before receiving a

30

confession or self-incriminating statement in evidence, "the trial judge shall, out of the presence of the jury, determine any issue as to voluntariness." United States v. Davidson, 768 F.2d 1266, 1270 n.1 (11th Cir. 1985).

A two-part inquiry determines the admissibility of a confession or self-incriminating statement. First, the Court must consider whether the Government complied with the requirements of Miranda v. Arizona, 384 U.S. 436 (1966). Second, if the Government met those requirements, the Court must consider whether the confession or self-incriminating statement was voluntary. United States v. Jones, 32 F.3d 1512, 1516 (11th Cir. 1994) (per curiam); United States v. Sims, 719 F.2d 375, 378 (11th Cir. 1983)

31

(per curiam).  The Court discusses those considerations in turn.

### a.   __Miranda__

In Miranda, the Supreme Court noted that, "when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized."  384 U.S. at 478.  The Supreme Court thus held that the procedural safeguard of warning the suspect of his constitutional rights must be instituted to protect the privilege.  Id. at 478-79.  Those so-called Miranda warnings "are required before any statement may be admitted into evidence at trial which was

32

elicited from a person in custody through interrogation."

Endress v. Dugger, 880 F.2d 1244, 1248 (11th Cir. 1989).

Here, it is undisputed that Defendant was in custody at all relevant times and that his statements were elicited through interrogation.  It also is undisputed that Defendant received his Miranda warnings and waived those rights verbally and in writing.  Thus, the first prong of the Court's analysis is satisfied, at least with respect to Defendant's statements made during transport and at the jail.  The sole dispute is whether the agents presented the Miranda warnings and waiver form to Defendant at the outset of the interview, as the Government contends, or near the end of the bedroom interview, as Defendant testified.

33

O 72A
Rev.8/82)

The Court agrees with Judge Johnson that "whether because of honestly mistaken memory or because a defendant facing felony charges has incentive to fabricate, [Defendant's] testimony does not outweigh the testimony at the hearing showing that Agents Mueller and Gilleland administered Miranda warnings to [Defendant] in his bedroom at the outset of their interview at approximately 8:40 a.m., as recorded on the Miranda waiver form that [D]efendant signed." (Non-Final Report & Recommendation at 20 (citing Govt. Ex. 1).)  The Court therefore declines to disturb Judge Johnson's finding that SA Mueller's testimony was more credible than Defendant's testimony.  (Id.)  For those reasons, the Court concludes that the Government complied with Miranda.

34

## 2.   Voluntariness

Determining whether a confession or incriminating statement is voluntary depends on whether, under all of the surrounding circumstances, the statement was the product of the accused's "free and rational" choice. <u>Jones</u>, 32 F.3d at 1516.  In <u>Arizona v. Fulminate</u>, 499 U.S. 279, 285-88 (1991), the Supreme Court held that the issue of voluntariness is determined by the totality of the circumstances.   In evaluating the totality of the circumstances, a district court must assess whether law enforcement conduct was "causally related" to the confession. <u>Jones</u>, 32 F.3d at 1516-17.  The United States Court of Appeals for the Eleventh Circuit applies the following standard:

35

> Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession. Isolated incidents of police deception, and discussions of realistic penalties for cooperative and non-cooperative defendants, are normally insufficient to preclude free choice.

Id. at 1517 (quoting United States v. Mendoza-Cecelia, 963 F.2d 1467, 1475 (11th Cir. 1992)).

The Court agrees with Judge Johnson that the totality of circumstances in this case shows that Defendant made his statements voluntarily. (Non-Final Report & Recommendation at 21.) As Judge Johnson noted, "There is no assertion that [D]efendant was subjected to an unusually long detention or interrogation or that he was physically harmed or threatened." (Id.) Moreover, although Defendant contends that the agents "threatened to charge

36

him with distribution of one million pills if he failed to give them a 'good number,'" the Court agrees with Judge Johnson that the agents simply gave Defendant "'a truthful and noncoercive statement of the possible penalties'" that Defendant faced, and that such a statement was permissible. (Id. at 21-22.)

The Court further agrees with Judge Johnson that, even presuming that the questioning took place as Defendant recalled, Defendant's own testimony demonstrates that his statements were voluntary. (Non-Final Report & Recommendation at 22-23.) As Judge Johnson noted:

> Defendant testified that he understood his rights based on hearing them on TV and that he answered questions without protest. (Tr. 85.) Defendant explained, "I figured it was my only chance to help myself. I needed to help myself all I could." (Id.)

37

(Id. at 22.)   Given that testimony, the Court agrees with Judge Johnson that the totality of the circumstances demonstrate that Defendant made a knowing, voluntary, and intelligent waiver of his right to remain silent. (Id.) The Court therefore adopts this portion of the Non-Final Report and Recommendation, and denies Defendant's Motion to Suppress Statements.

## B.   Search of Defendant's Residence

Defendant contends that the "search of the safe and the wallet went beyond the scope of any consent [he] could be construed as having given." (Def.'s Br. at 10.)   "A consensual search is manifestly reasonable so long as it remains within the scope of the consent." United States v. Martinez, 949 F.2d 1117, 1119 (11th Cir. 1992) (citing

38

<u>Florida v. Jimeno</u>, 500 U.S. 248, 249 (1991)).  "When a defendant gives a general statement of consent, the scope of the permissible search 'is constrained by the bounds of reasonableness: what a police officer could reasonably interpret the consent to encompass.'"  <u>United States v. Telcy</u>, 362 F. App'x 83, 87 (11th Cir. 2010) (per curiam) (quoting <u>United States v. Street</u>, 472 F.3d 1298, 1308 (11th Cir. 2006)).

Judge Johnson noted:

> [D]efendant verbally consented to a search of the house in response to SA Mueller's query whether there were weapons, cash, or narcotics in the house.  In addition, [D]efendant signed a form granting consent to search his property and vehicles. (Govt. Ex. 2.) Permission to search an area for narcotics "may be construed as permission to search any compartment or container within the specified area where narcotics may be found." <u>Martinez</u>, 949 F.2d at 1119.

AO 72A
(Rev.8/82)

There is no evidence as to where the wallet was found, only that it was handed to SA Mueller by another agent. (Tr. 48-49.) At that time, given [D]efendant's general consent to the search for cash and narcotics (either of which might be found in a wallet), it was reasonable for SA Mueller to believe the consent encompassed the wallet.

The remaining issue is whether [D]efendant limited his consent when the agents asked him to open the safe. SA Mueller testified that when he asked [D]efendant to open the safe, [D]efendant did so without asking whether he was required to and without asking multiple times whether he had to open the safe. (Tr. 33.) [Defendant] testified that he acquiesced to opening the safe only after SA Gilleland reiterated approximately five times that [D]efendant had to open it. (Id. at 70.) However, [D]efendant did not refuse to open the safe. See, e.g., United States v. Rios, No. 2:09-cr-52-FtM-29DNF, 2009 WL 4510111, at *5 (M.D. Fla. Nov. 30, 2009) ("When the Defendant indicated that he would not consent to a search of the locked safe, [police officer] stopped searching the room and went to obtain a search warrant."). The Court again finds SA Mueller's testimony on this point credible. Thus, no basis exists to

40

suppress the items found in [D]efendant's wallet or safe.

(Non-Final Report & Recommendation at 23-25 (footnote omitted).)[20]   The Court agrees with Judge Johnson that Defendant consented to the search, and that the search of Defendant's wallet and safe did not fall outside the scope of Defendant's consent.   The Court consequently adopts this portion of the Non-Final Report and Recommendation, and denies the Motion to Suppress Evidence.

## IV.   Conclusion

---

[20]Judge Johnson correctly noted: "Although his testimony did not match SA Mueller's, [D]efendant did not testify to any objection he might have made when the agents 'said something about looking around the house or whatever.'" (Non-Final Report & Recommendation at 23 n.21 (quoting Tr. at 64-65).)

41

ACCORDINGLY, the Court **ADOPTS** the Non-Final Report and Recommendation of United States Magistrate Judge Walter E. Johnson [290], **DENIES** Defendant's Motion to Suppress Statements and Motion for Jackson/Denno Hearing [216], and **DENIES** Defendant's Amended Motion to Suppress Statements and Motion for Jackson/Denno Hearing and Motion to Suppress Evidence [242].

IT IS SO ORDERED, this the ⁊ day of July, 2011.

_____
UNITED STATES DISTRICT JUDGE

42